Gina M. Serra, SBN 361172
**RIGRODSKY LAW, P.A.**
1091 N. Palm Canyon Drive, Suite 9
Palm Spring, CA 92262
Telephone: (760) 406-8009
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JOSHUA STEFFENS, Derivatively on
Behalf of Nominal Defendant C3.AI, INC.,

    Plaintiff,

    v.

THOMAS M. SIEBEL, HITESH LATH,
CONDOLEEZZA RICE, RICHARD C.
LEVIN, MICHAEL G. MCCAFFERY,
BRUCE SEWELL, LISA A. DAVIS, JIM
H. SNABE, STEPHEN M. WARD, JR., KR
SRIDHAR, ALAN MURRAY, JOHN
HYTEN, and KENNETH A. GOLDMAN,

    Defendants,

    and

C3.AI, INC.,

    Nominal Defendant.

Case No. _____

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joshua Steffens ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant C3.ai, Inc. ("C3 AI" or the "Company"), against current members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and

violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding C3 AI, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Liggett Sr. v. C3 AI, Inc., et al,* Case No. 3:25-cv-07129-TLT (N.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## <u>NATURE OF THE ACTION</u>

1.    This is a shareholder derivative action brought by Plaintiff on behalf of C3 AI against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least February 26, 2025, and August 8, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.    Founded by Defendant Siebel in 2009, C3 AI is an "Enterprise [artificial intelligence ("AI")] application software company."

3.    The Company offers three primary families of software solutions, collectively referred to as "C3 AI Software": (i) C3 Agentic AI Platform, an end-to-end platform for developing, deploying, and operating Enterprise AI

---

[1] Individual Defendants are Thomas M. Siebel ("Siebel"), Hitesh Lath ("Lath"), Condoleezza Rice ("Rice"), Richard C. Levin ("Levin"), Michael G. McCaffery ("McCaffery"), Bruce Sewell ("Sewell"), Lisa A. Davis ("Davis"), Jim H. Snabe ("Snabe"), Stephen M. Ward, Jr. ("Ward"), KR Sridhar ("Sridhar"), Alan Murray ("Murray"), John Hyten ("John Hyten"), and Kenneth A. Goldman ("Goldman"). The Individual Defendants, together with C3 AI, are "Defendants."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

applications; (ii) C3 AI Applications, a portfolio of industry-specific Enterprise AI applications that enable the digital transformation of organizations globally; and (iii) C3 Generative AI — library of agentic AI applications to retrieve data, analyze information, surface insights, and orchestrate workflows to drive business value.

4.      As detailed herein, throughout the Relevant Period, despite speculation surrounding Defendant Siebel's health, the Individual Defendants repeatedly touted to investors that the Company was able to function profitably and maintain its growth projections.

5.      However, in reality, Defendant Siebel faced health issues, including vision impairment and repeat hospitalization, which diminished his effectiveness as a leader, which in turn had a negative effect on the Company's ability to perform, given its heavy reliance on Defendant Siebel as its Chairman, CEO, and founder.

6.      The truth was revealed on August 8, 2025, when the Company issued a press release announcing its preliminary financial results for the first quarter of fiscal year 2026 (the "Preliminary 1Q25 Earnings Release").[2] In the Preliminary 1Q25 Earnings Release, the Company reduced its revenue guidance for the full fiscal year for 2026, attributing the reduction to C3 AI's "reorganization with new leadership," and finally admitting that the Company's performance was harmed by Defendant's Siebel's diminishing health.

7.      On this news, the Company's stock price declined $5.66 per share, or approximately 25.6%, to close at $16.47 per share on August 11, 2025.

8.      As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public concerning the Company's

---

[2] The Company's fiscal year starts on May 1 of each year and ends on April 30.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) Defendant Siebel was suffering from health issues, which was negatively impacting the Company's ability to close deals; (ii) the Company's management was unable to minimize the negative impact on C3 AI; (iii) as a result, the Company could not execute its profit and growth projections; (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Siebel and Lath on August 22, 2025, in the United States District Court for the Northern District of California.

10.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

11.    Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of C3 AI's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## **JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78(j)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

13.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

16.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, C3 AI is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# PARTIES

***Plaintiff***

19.    Plaintiff is, and has been at all relevant times, a continuous shareholder of C3 AI. Plaintiff is a citizen of Florida.

***Nominal Defendant***

20.    Nominal Defendant C3 AI is a Delaware corporation with its principal executive offices located at 1400 Seaport Boulevard, Redwood City, California 94063. C3 AI's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AI."

***Individual Defendants***

21.    Defendant Siebel is the founder of the Company and has served as Chairman of the Board since January 2009. Siebel also served as Chief Executive Officer ("CEO") of the Company from July 2011 until September 1, 2025. According to the proxy statement filed by the Company on a Schedule 14A with the SEC on August 21, 2025 (the "2025 Proxy"), Defendant Siebel received $25,516,876 in total compensation from the Company during fiscal year 2025. As of August 4, 2025, Defendant Siebel beneficially owned 51.4% of the Company's total voting power. Upon information and belief, Defendant Siebel is a citizen of California.

22.    Defendant Lath has served as Senior Vice President and Chief Financial Officer ("CFO") of the Company since March 2024. Lath previously served as Vice President and Chief Accounting Officer of the Company from December 2023 until February 2024. According to the 2025 Proxy, Defendant Lath received $9,999,906 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Lath is a citizen of California.

23.    Defendant Rice has served as a director of the Company since December 2009. According to the 2025 Proxy, Defendant Rice received $349,999

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Rice is a citizen of California.

24.    Defendant Levin has served as a director of the Company since August 2010. Levin also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Levin received $349,999 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Levin is a citizen of Connecticut.

25.    Defendant McCaffery has served as a director of the Company since March 2009. McCaffery also serves as Lead Independent Director of the Company, as Chair of the Company's Audit Committee, and as a member of the Company's Nominating and Corporate Governance Committee. According to the 2025 Proxy, Defendant McCaffery received $414,989 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant McCaffery is a citizen of California.

26.    Defendant Sewell has served as a director of the Company since May 2017. Sewell also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Compensation Committee. According to the 2025 Proxy, Defendant Sewell received $369,999 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Sewell is a citizen of California.

27.    Defendant Davis has served as a director of Company since December 2021. Davis also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Davis received $349,999 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Davis is a citizen of California.

28.    Defendant Snabe has served as a director of the Company since February 2021 and as a special advisor to the CEO since February 2025. According

to the 2025 Proxy, Defendant Snabe received $7,927,999 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Snabe is a citizen of Denmark.

29.     Defendant Ward has served as a director of the Company since January 2009. According to the 2025 Proxy, Defendant Ward received $369,999 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Ward is a citizen of Connecticut.

30.     Defendant Sridhar has served as a director of the Company since February 2023. Sridhar also serves as a member of the Company's Compensation Committee. According to the 2025 Proxy, Defendant Sridhar received $699,997 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Sridhar is a citizen of California.

31.     Defendant Murray has served as a director of the Company since May 2024. According to the 2025 Proxy, Defendant Murray received $899,992 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Murray is a citizen of Connecticut.

32.     Defendant Hyten has served as a director of the Company since October 2024. Hyten previously served as an advisor to the Company from May 2022 until October 2024. According to the 2025 Proxy, Defendant Hyten received $349,999 in total compensation from the Company during fiscal year 2025. Upon information and belief, Defendant Hyten is a citizen of Colorado.

33.     Defendant Goldman has served as a director of the Company since May 2025. Goldman also serves as a member of the Company's Audit Committee. Upon information and belief, Defendant Goldman is a citizen of California.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

34.     By reason of their positions as officers and/or directors of C3 AI, and because of their ability to control the business and corporate affairs of C3 AI, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Individual Defendants owed C3 AI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage C3 AI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of C3 AI and its shareholders.

35.    Each director and officer of the Company owes to C3 AI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of C3 AI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.    To discharge their duties, the officers and directors of C3 AI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of C3 AI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the

Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.    To discharge their duties, the officers and directors of C3 AI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of C3 AI were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to C3 AI's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how C3 AI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and

reports of the business and internal affairs of C3 AI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that C3 AI's operations would comply with all applicable laws and C3 AI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41.    Each of the Individual Defendants further owed to C3 AI and the shareholders the duty of loyalty requiring that each favor C3 AI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42.    At all times relevant hereto, the Individual Defendants were the agents of each other and of C3 AI and were at all times acting within the course and scope of such agency.

43.    Because of their advisory, executive, managerial, and directorial

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

positions with C3 AI, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by C3 AI.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

45.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

47.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

48.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of C3 AI, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

50.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of C3 AI and at all times acted within the course and scope of such agency.

## C3 AI'S CODE OF CONDUCT

51.     C3 AI's Code of Conduct states that it "addresses the conduct of C3 AI employees, officers and directors."

52.     Under the section titled "Honest and Ethical Conduct," the Code of Conduct states:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. C3 AI's integrity and reputation depend on the fairness and integrity brought to the job by each person associated with us. Personal integrity and sound judgment are the foundation of C3 AI's corporate integrity.

53.     Under the section titled "Legal Compliance," the Code of Conduct states:

> Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to be familiar with and comply with other C3 AI policies relating to legal compliance, including C3 AI's Anti-Corruption Policy and Insider Trading Policy. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as C3 AI, to civil and/or criminal penalties, and may be grounds for disciplinary action, up to and including termination of employment.

54.     Under the section titled "Insider Trading," the Code of Conduct states:

Employees, officers and directors who have access to material, non-public (or "inside") information are not permitted to use or share that information for stock trading purposes. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to C3 AI's Insider Trading Policy for more detailed information.

55.     Under the section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

C3 AI expects its employees, officers and directors to be free from influences that conflict with the best interests of C3 AI or might deprive C3 AI of their undivided loyalty in business dealings. Making judgments, taking decisions, or pursuing actions when facing a conflict of interest may make it difficult to perform duties objectively and effectively and may have legal or regulatory consequences. Employees, officers and directors should avoid situations where their personal interests (financial or otherwise) may conflict with or compromise C3 AI's interest, could potentially result in a conflict of interest or could otherwise have the appearance of impropriety.

While it is not possible to list all potential conflicts of interest, some of the more common conflicts would include: (a) outside employment, consulting, or board service; (b) holding a financial or other interest in a customer, vendor or partner of C3 AI, an entity seeking to do business with us or a competitor; or (c) soliciting
or accepting gifts, favors, loans or preferential treatment from any person or entity that does business or seeks to do business with us. Additional detail on each of these potential conflicts of interest—as well as other areas of potential concern—may be found in the C3 AI Employee Handbook.

56.     Under the section titled "Financial Integrity," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of

14
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. If you have any concerns about how to comply with this policy, or if you observe conduct or actions that do not seem to comply with this policy, you should immediately discuss such concerns with the General Counsel.

## **C3 AI'S AUDIT COMMITTEE CHARTER**

57.     Pursuant to C3 AI's Audit Committee Charter, the purpose of the Audit Committee is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services(the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements;
  help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

58.     Under the section titled "Responsibilities," the Audit Committee Charter tasks the Audit Committee with the following responsibilities, among others:

***Financial Review and Disclosure:***

**5.     Annual Audit Results.** The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;
- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes

in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

**6.    Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**7.    Proxy Report.** After the Public Effective Date, the Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

**8.    Accounting Principles and Policies.** The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

- critical accounting policies and practices;

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications. The Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB) on at least an annual basis, to the extent required by such rules.

**9.     Management Cooperation with Audit.** The Committee will evaluate management's cooperation with the Auditors during their audit examination, and expect disclosure of any significant difficulties or disagreements encountered during the audit, if any.

***Internal Control and Procedures:***

**10.     Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee shall review and approve as appropriate the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and to review and discuss with management the Company's Foreign Exchange Policy, including the Company's use of swaps.

**11.     Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

**12.     Correspondence with Regulators.** The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material

issues regarding the Company's financial statements or accounting policies.

**13. Internal Control Report.** At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors. . . .

*Other Matters*. . . .

**18. Other Legal and Finance Matters.** The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

59. Founded by Defendant Siebel in 2009, C3 AI is an "Enterprise AI application software company."

60. The Company's customers can deploy its software on major public cloud infrastructures, private cloud or hybrid environments, or directly on their servers and processors.

61. C3 AI offers three primary families of software solutions, collectively referred to as "C3 AI Software": (i) C3 Agentic AI Platform, an end-to-end platform for developing, deploying, and operating Enterprise AI applications; (ii) C3 AI Applications, a portfolio of industry-specific Enterprise AI applications that enable the digital transformation of organizations globally; and (iii) C3 Generative AI — library of agentic AI applications to retrieve data, analyze information, surface insights, and orchestrate workflows to drive business value.

62. The Company highlights its C3 Agentic AI Platform as its "core technology" and asserts that it is "only end-to-end platform-as-a-service that allows

customers to rapidly design, develop, provision, and operate Enterprise AI applications at scale" and that C3 AI's customers "can use the C3 Agentic AI Platform to build and operate their own custom Enterprise AI applications and to customize, operate, and manage C3 AI Applications."

63.     As part of its growth strategy, C3 AI claims that it is "investing in the expansion of [C3 AI's] direct enterprise sales and service organization both geographically and across vertical markets to expand the use of C3 AI solutions within existing customers and establish new customer relationships." The Company purports that it accomplishes its growth strategy, in part, because its customers "frequently identify incremental opportunities within their operations and expand their use of [C3 AI's] products."

**The Individual Defendants' False and Misleading Statements**

64.     On February 26, 2025, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2025 (the "3Q25 Earnings Release"). On the same day, the Company hosted an accompanying earnings call to discuss its financial results for the third quarter of fiscal year 2025 (the "3Q25 Earnings Call"), during which Defendant Siebel addressed concerns regarding his health, assuring investors that he was fully able to perform his role at C3 AI. During the question and answer section of the 3Q25 Earnings Release, in response to a question about "what the health setback was and what steps you're taking in terms of running the business," Defendant Siebel stated, in relevant part:

> Now as it relates to operating the business, it has so -- Tom has to learn some new skills, and we put the accommodations in place. I mean, you know me to be intimately familiar with the details of this business, okay? And you can imagine that we spent exacting detail with this management team on how we were reorganizing this company around this new opportunity that's here.
>
> **We've done the same -- we have the same meeting with all of our salespeople around from the world. I spent a lot of time personally with all of the -- a lot of time personally, okay, with all of the partners that we've discussed. I put the accommodations in place for -- about**

*really the only thing I can't do is read e-mail. So the -- so we put the [compensation] in place, there is somebody here with a hot computer, who reads the e-mails to me. I comment, I respond, I approve, I don't prove, what have you. I am here in the office. I am managing the business every day.* [3]

In the short term, my travel, the medical community has me on kind of – they don't want me going real far or a high altitude. *And so we've made arrangements for Jim Snabe, who you most certainly know or know of and one of our more distinguished directors.*

Jim, of course, was the Co-CEO of SAP, Chairman of Maersk, Chairman of Allianz, Chairman of [Siemens]. And so Jim assumed the role as a special assistant to the Chief Executive, okay? And he's filling in for the events that Tom can't do. Let's say, I was supposed to be at VivaTech at Paris or what have you or maybe we need to do an executive customer review at Shell in London.

And so this is how it's organized. *I am fully engaged, managing every details of the business every day, as you know me a little bit and you know I'm generally in touch with those details. My health is excellent, okay?* So beyond all of the infirmities that I had, I just can't see.

65.    On May 28, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year of fiscal year 2025 (the "4Q25 Earnings Release"). On the same day, the Company hosted an accompanying earnings call for investors and analysts to discuss its financial results for the fourth quarter and full year for fiscal year 2025 (the "4Q25 Earnings Call"). During the 4Q24 Earnings Call, Defendant Siebel discussed the state of the market demand and the Company's business growth prospects, stating, in relevant part:

Now let's look at where we are, the facts of the market in -- I'm sorry, May of 2025, okay? *We have a generally acknowledged, large and rapidly growing market.* And we look at the AI stack and the companies that are playing at the bottom of the stack. We have the silicon providers, the Intels, the AMDs, the NVIDIAs. Above that, we have the infrastructure providers, the Microsoft Azure, AWS, GCP, et cetera. On top of that, we have the people providing the foundation models like OpenAI and Anthropic, Facebook, et cetera. On top of that, we have the providers of many thousands of utilities that are out there that do things like platform independent, relational database persistence or key value stores or AutoML or virtualization or whatever it may be. . . .

---

[3] Emphasis is added unless otherwise noted.

The result of this, we've experienced -- as a result of the kind of realization of this enterprise AI kind of reality, *we've seen enormous growth in our market,* again, in the last few years, going from 6% to 16% to 25%. *And our focus, if we look at Q3 and Q4 of fiscal year '25 has been building an ecosystem to be able to address this huge sucking sound that we hear out there, that is the demand for enterprise AI applications*. And in order to address these applications, we need an army of partners. And so *we have been focused in the last few quarters on establishing this army of strategic partners and enabling this army of strategic partners to be effective at communicating the benefits of these applications and selling these applications*. . . .

Our revenue growth rate continues to exceed our expense growth rate. Fast math without the Excel spreadsheet. *It follows ipso facto, the cash possibility and non-GAAP profitability is simply a matter of scale*. And I expect in 2027 and beyond, we will cross that path into consistent cash positivity and an annualized non-GAAP profitability thereafter. So it was a great quarter, a great year. Customers are happy, products are excellent, market is huge. And if there is anybody else in the Enterprise AI applications business, I'm unaware of who they are.

66.     Also during the 4Q25 Earnings Call, C3 AI's Agentic AI reported that:

And finally, we expect to see accelerating growth driven by the Generative AI and Agentic AI markets where our solutions are highly differentiated, highly beneficial and address a market opportunity that is incalculably large. The Enterprise AI landscape is at an inflection point and C3 AI stands ready to lead. The convergence of market demand and our proven capabilities creates a unique opportunity to drive sustained growth by combining best-in-class technology with a world-class network of partners and a relentless focus on customer value, we are poised to shape the future of business operations across industries. As we step into fiscal 2026, our path is clear. Our momentum is strong, and our commitment to delivering impactful AI solutions has never been greater.

67.     Defendant Lath provided the Company's financial guidance for the first quarter and full year for fiscal year 2026 during the 4Q25 Earnings Call, stating, in relevant part:

Now I'll move on to our guidance for the next quarter. *Our revenue guidance for Q1 of fiscal '26 is $100 million to $109 million. For the full fiscal 2026, we are anticipating revenue in the range of $447.5 million to $484.5 million. Our guidance for non-GAAP loss from operations for the first quarter is $23.5 million to $33.5 million. And our non-GAAP loss from operations for the year, the guidance is $65 million to $100 million*. Our guidance is predicated on the assumption of geopolitical stability. Were there to be a situation that the U.S. government closed, the budget did not pass, or we see indications of

21
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

global trade friction, given the reality of these market risks, those could have unknown and adverse consequences on our business results.

Last year, our revenue growth was 25% and our expenses grew by 18%. *As we approach fiscal '26, we expect the revenue growth rate to continue to exceed our expense growth rate. So profitability remains simply a matter of scale*. Our expectation is that we will cross into non-GAAP profitability during the second half of fiscal '27, and we expect to be free cash flow positive in the fourth quarter of fiscal '26 and in successive years thereafter.

68.    During the question and answer portion of the 4Q25 Earnings Call, in response to a question about Defendant Siebel's health setback, Defendant Siebel assured investors that his health had improved, stating, in relevant part:

*I did get slowed down for a little bit. There's no question about it.* And I had -- it's very unlikely to work from home. You know that. And *I had to work from home for a little while and take it easy and recover*, but I will catch a red eye to Washington, D.C. tonight. I will be in Washington, D.C. again for 3 days, I think, 10 days from now after attending a wedding in Cabo. *So just when you thought it was safe, Pat, I'm back*.

69.    Also during the question and answer portion of the 4Q25 Earnings Call, in response to a question on the Company's fiscal year 2026 guidance, Defendant Siebel defended the Company's larger-than-usual range, stating, in relevant part:

Well, we read the same newspaper that you guys read. And we do talk to the President, and I had dinner with the speaker of the house last night. I spoke with the leader of the Senate last week, and I'll meet -- and so we do know these people and we do read the newspaper. And we all know there is risk. There is risk in Europe. We have kinetic risk. We have geopolitical risk. We have risk -- we have budget risk of, in fact, the government even shutting down. And these are real. And we have companies out there that were withdrawing guidance altogether. And we thought in the interest of being -- we have to acknowledge that these risks are real. And so that results -- as a result, we have a broader range than usual to accommodate the unanticipated. And when we deal with these guys who are making America great again, they seem to hit us with the unanticipated quite frequently. So that's it. We're just acknowledging very real risk -- market risk that's out there. And should it go bad, it's going to have an adverse effect on our business as it will, General Motors and everybody else in the world.

70.    On July 24, 2025, the Company issued a press release announcing that the Company "has initiated a search for Mr. Siebel's successor as Chief Executive

Officer of C3 AI." Defendant Siebel was quoted in this press release, assuring investors that he would remain engaged until his successor was found, stating, in relevant part:

> After being diagnosed with an autoimmune disease in early 2025, I have experienced significant visual impairment . . . ***I will remain fully engaged as Chief Executive Officer of C3.ai*** until such time as the C3.ai board appoints my successor after which I will continue in the role of Executive Chairman focusing on strategy, product innovation, strategic partner and customer relationships.

71.    The statements detailed above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) Defendant Siebel was suffering from health issues, which was negatively impacting the Company's ability to close deals; (ii) the Company's management was unable to minimize the negative impact on C3 AI; (iii) as a result, the Company could not execute its profit and growth projections; (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

72.    The truth was revealed on August 8, 2025, when the Company issued the Preliminary 1Q25 Earnings Release. In the Preliminary 1Q25 Earnings Release, the Company reduced its revenue guidance for the full fiscal year 2026, stating, in relevant part:

**Fiscal First Quarter 2026 Preliminary Business Update**

- Total revenue for the quarter was $70.2 million – $70.4 million.

- GAAP loss from operations was ($124.7) million – ($124.9) million.

- Non-GAAP loss from operations was ($57.7) million – ($57.9) million.

- $711.9 million in cash, cash equivalents, and marketable securities as of July 31, 2025.

73.    Also on August 8, 2025, the Company issued a second press release announcing that it was restructuring its sales and service organizations (the "Restructuring Press Release"). Defendant Siebel was quoted in the Restructuring Press Release as stating:

> The good news is we have completely restructured the sales and services organization, including new and highly experienced leadership across the board to ensure a return to accelerating growth and increased customer success at C3 AI. ***The bad news is that sales results in Q1 were completely unacceptable***. Having given this a lot of thought, I attribute this to ***two factors. One: It is clear that in the short term, the reorganization with new leadership had a disruptive effect. Two: As we have previously announced, I have had a number of health issues in the past six months*** including multiple hospitalizations and vision impairment. Unfortunately, dealing with these health issues prevented me from participating in the sales process as actively as I have in the past. With the benefit of hindsight, ***it is now apparent that my active participation in the sales process may have had a greater impact than I previously thought***.

74.    On this news, the Company's stock price declined $5.66 per share, or approximately 25.6%, to close at $16.47 per share on August 11, 2025.

***Post-Relevant Period Events***

75.    In response, a number of well-known analysts who had been following C3 AI closely lowered their price targets. For instance, Oppenheimer, while downgrading to market performance and altogether removing their price target, highlighted the Company's "extremely weak preliminary 1Q26 results," noting C3 AI "significantly lowered revenue expectations for 1Q26, from ~$105M to ~$70M, implying a 35% sequential decline and a major concern given the recurring nature of its Subscription revenues, suggesting the services are not working as advertised."

76.    Additionally, on September 6, 2025, the Company filed a Form 8-K with the SEC announcing that Siebel was officially stepping down as CEO of the

Company and that the Board had "unanimously appointed Stephen Ehikian as the Company's Chief Executive Officer, effective September 1, 2025. Thomas M. Siebel will continue to be engaged as Executive Chairman."

***Insider Sales***

77.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Siebel, Lath, Hyten, Sewell, and Ward sold shares of the Company's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

78.     While the Company's stock price was artificially inflated, Defendant Siebel sold 3,450,133 shares of C3 AI common stock, totaling proceeds of nearly $81.8 million. Defendant Siebel made the following sale of C3 AI stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 3/14/2025 | 294,116 | $21.50 | $6,323,494 |
| 3/17/2025 | 216,974 | $21.88 | $4,747,391 |
| 3/18/2025 | 127,991 | $22.04 | $2,794,380 |
| 4/14/2025 | 373,169 | $20.46 | $7,534,097 |
| 4/15/2025 | 238,929 | $19.92 | $4,759,466 |
| 4/16/2025 | 14,201 | $19.47 | $276,493 |
| 5/2/2025 | 27,010 | $22.27 | $601,634 |
| 5/13/2025 | 341,698 | $24.00 | $8,200,752 |
| 5/14/20225 | 272,079 | $23.99 | $6,527,175 |
| 6/2/2025 | 17,000 | $26.30 | $447,100 |
| 6/11/2025 | 601,498 | $25.39 | $15,051,342 |
| 7/18/2025 | 589,468 | $28.90 | $16,844,450 |
| 8/4/2025 | 336,000 | $22.77 | $7,650,720 |

79.     While the Company's stock price was artificially inflated, Defendant Lath sold 32,286 shares of C3 AI common stock, totaling proceeds of over $800,000. Defendant Lath made the following sale of C3 AI stock during the Relevant Period:

| Transaction Date | Number of | Average Price | Total |
|---|---|---|---|

|  | Shares Sold | Per Share | Transaction |
|---|---|---|---|
| 3/15/2025 | 4,289 | $21.61 | $92,685 |
| 5/29/2025 | 4,368 | $28.16 | $128,652 |
| 6/16/2025 | 6,040 | $24.19 | $146,108 |
| 6/27/2025 | 17,689 | $24.97 | $441,604 |

80.     While the Company's stock price was artificially inflated, Defendant Hyten sold 10,000 shares of C3 AI common stock, totaling proceeds of approximately $237,500. Defendant Hyten made the following sale of C3 AI stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 6/13/2025 | 10,000 | $23.75 | $237,500 |

81.     While the Company's stock price was artificially inflated, Defendant Sewell sold 79 shares of C3 AI common stock, totaling proceeds of approximately $2,000. Defendant Sewell made the following sale of C3 AI stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 6/11/2025 | 79 | $26.00 | $2,054 |

82.     While the Company's stock price was artificially inflated, Defendant Ward sold 42,382 shares of C3 AI common stock, totaling proceeds of approximately $1.1 million. Defendant Ward made the following sale of C3 AI stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 5/29/2025 | 42,382 | $26.32 | $1,115,494 |

83.     As a result of these insider sales, Defendants Siebel, Lath, Hyten, Sewell, and Ward were unjustly enriched.

***Harm to the Company***

84.     As a direct and proximate result of the Individual Defendants'

misconduct, C3 AI has lost and expended, and will lose and expend, millions of dollars.

85.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Siebel and Lath, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

86.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

87.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

89.    C3 AI is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

90.    Plaintiff is a current shareholder of C3 AI and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

91.    A pre-suit demand on the Board of C3 AI is futile and, therefore, excused. At the time this action was commenced, the twelve-member Board was comprised of Defendants Siebel, Rice, Levin, McCaffery, Sewell, Davis, Snabe, Ward, Sridhar, Murray, Hyten, and Goldman (the "Director Defendants"), Accordingly, Plaintiff is only required to show that six Director Defendants cannot

exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

92.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

93.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

94.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

95.    Defendant Siebel is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Siebel is the founder of the Company and also serves as Executive Chairman of the Board. Siebel also previously served as the Company's CEO from 2011 until September 1, 2025. Moreover, Defendant Siebel owns 51.4% of the Company's total voting power. Thus, as conceded by the 2025 Proxy, Defendant Siebel is a non-independent director. Furthermore, Defendant Siebel is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially

false and misleading statements during the Relevant Period.

96.     Defendnant Snabe is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Defendant Snabe also serves as a special advisor to the Company's CEO. Thus, as conceded by the 2025 Proxy, Defendant Snabe is a non-independent director.

97.     Defendant Hyten is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Defendant Hyten also served as a special advisor to the Company from May 2022 until October 2024. Thus, as conceded by the 2025 Proxy, Defendant Hyten is a non-independent director.

98.     Defendants Goldman, Levin, McCaffery, and Davis serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

99.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business

conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

100.   All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

101.   Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

102.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

103.   Furthermore, Individual Defendants Siebel, Hyten, Sewell, and Ward received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

104.   The acts complained of herein constitute violations of fiduciary duties owed by C3 AI's officers and directors, and these acts are incapable of ratification.

105.   Thus, for all of the reasons set forth above, the Director Defendants are

unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**COUNT I**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

108.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

109.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110.   Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) Defendant Siebel was suffering from health issues, which was negatively impacting the Company's ability to close deals; (ii) the Company's management was unable to minimize the negative impact on C3 AI; (iii) as a result, the Company could not execute its profit and growth projections; (iv) the Company failed to maintain

adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111.  In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

112.  Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

113.  Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

114.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

115.  As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

116.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not

only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

117. Plaintiff, on behalf of C3 AI, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

120. Plaintiff, on behalf of C3 AI, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants**
**For Unjust Enrichment**

121. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, C3 AI.

123. The Individual Defendants either benefitted financially from the

improper conduct, or received bonuses, stock options, or similar compensation from C3 AI that were tied to the performance or artificially inflated valuation of C3 AI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

124.    Plaintiff, as a shareholder and a representative of C3 AI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

125.    Plaintiff, on behalf of C3 AI, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants**
**For Waste of Corporate Assets**

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

128.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

129.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

130.    Plaintiff, on behalf C3 AI, has no adequate remedy at law.

**COUNT V**

**Against Defendants Siebel and Lath**
**for Contribution Under Sections 10(b) and 21D of the Exchange Act**

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    C3 AI and Defendants Siebel and Lath are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Siebel's and Lath's willful and/or reckless violations of their obligations as officers and/or directors of C3 AI.

133.    Defendants Siebel and Lath, because of their positions of control and authority as officers and/or directors of C3 AI, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of C3 AI, including the wrongful acts complained of herein and in the Securities Class Action.

134.    Accordingly, Defendants Siebel and Lath are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

135.    As such, C3 AI is entitled to receive all appropriate contribution or indemnification from Defendants Siebel and Lath.

136.    Plaintiff, on behalf C3 AI, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in

a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

       B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

       C.     Awarding punitive damages;

       D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

       E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 9, 2025         **RIGRODSKY LAW, P.A.**

By:   */s/ Gina M. Serra*
        Gina M. Serra, SBN 361172
        1091 N. Palm Canyon Drive, Suite 9
        Palm Spring, CA 92262
        Telephone: (760) 406-8009
        Facsimile: (302) 654-7530
        Email: gms@rl-legal.com

        -and-

**OF COUNSEL:**        Vincent A. Licata
                Leah B. Wihtelin
**GRABAR LAW OFFICE**   825 East Gate Boulevard, Suite 300
Joshua H. Grabar          Garden City, NY 11530
One Liberty Place         Telephone: (516) 683-3516
1650 Market Street, Suite 3600  Email: vl@rl-legal.com
Philadelphia, PA 19103      Email: lw@rl-legal.com
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com   *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT